# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CITY OF FORT LAUDERDALE POLICE AND FIREFIGHTERS' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACADIA HEALTHCARE COMPANY, INC., DEBRA K. OSTEEN, CHRISTOPHER H. HUNTER, DAVID M. DUCKWORTH, and HEATHER DIXON,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff the City of Fort Lauderdale Police and Firefighters' Retirement System ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Acadia Healthcare Company, Inc. ("Acadia Healthcare," "Acadia," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Acadia Healthcare securities between February 8, 2020 and October 30, 2024, inclusive (the "Class Period") against Acadia Healthcare and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Acadia Healthcare provides behavioral healthcare services in the United States.  As of 2023, Acadia operates 253 behavioral healthcare facilities with approximately 11,200 beds in 38 states and Puerto Rico.  Acadia's facilities include acute inpatient psychiatric facilities, specialty treatment facilities, comprehensive treatment centers ("CTCs"), and residential treatment centers.

3.     Most of Acadia's revenue comes from acute inpatient psychiatric facilities.  Acadia claims its acute inpatient psychiatric facilities provide a "high level of care" to stabilize patients that are a threat to themselves or others, and that typical lengths of stay for "crisis stabilization" and "acute care" range from three to five days and from five to twelve days, respectively.

4.     Acadia receives payments from various payors, including state governments under their Medicaid and other programs, commercial insurers, the federal government under the Medicaid program administered by the Centers for Medicare and Medicaid Services ("CMS"), and individual patients and clients.  As of 2023, Acadia received most of its payments from Medicaid.

5.     Throughout the Class Period, Defendants touted, among other things, the quality and safety of Acadia's inpatient services and the Company's strong financial performance driven by solid volumes and growth in patient days (*i.e.*, length of stay) and same facility revenue. Defendants further touted strong revenue trends driven by rate increases across all payors and positive coverage and reimbursement trends for Medicaid, Acadia's largest source of revenue.

6.     Unbeknownst to investors, however, Acadia admitted and held patients against their will in its facilities, and kept patients beyond the length of time that was medically necessary—an undisclosed scheme to deceive payors into continuing to pay for such patients' care.  For example, the Company deployed "assessors" to pressure emergency rooms to send patients to Acadia facilities, and Acadia would not release patients until their insurance ran out.  Acadia also filed frivolous petitions with courts to delay patients' release and told employees to use "buzzwords" and omit other words in patients' charts to create a false impression of their mental state.

7.     On September 1, 2024, the truth began to emerge when *The New York Times* (the "*NYTimes*") published an article entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients" (the "Article").  According to the Article, a *NYTimes* investigation found that some of Acadia Healthcare's success "was built on a disturbing practice: Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary."

8.     The Article details how, "at Acadia, patients were often held for financial reasons rather than medical ones, according to more than 50 current and former executives and staff members."  The Article further describes how, "[i]n at least 12 of the 19 states where Acadia operates psychiatric hospitals, dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law. . . .  In some cases, judges have intervened to force Acadia to release patients."

9.     On this news, the price of Acadia Healthcare common stock fell more than 4.5%, from a closing price of $81.93 per share on August 30, 2024, the prior trading day, to a closing price of $78.21 per share on September 3, 2024, the following trading day.

10.     On September 26, 2024, the *NYTimes* published another article, entitled "Acadia Hospitals Reach $20 Million Settlement With Justice Dept."  The article explains that Acadia had

agreed to a nearly $20 million settlement with the U.S. Department of Justice (the "DOJ"), related to a DOJ investigation into the Company's practices of holding "patients for longer than necessary" at its facilities and admitting "people who didn't need to be there."

11.     On September 27, 2024, before the markets opened, Acadia disclosed that on September 24, 2024 it had received a request for information from the U.S. Attorney's Office for the Southern District of New York and a grand jury subpoena from the U.S. District Court for the Western District of Missouri "related to its admissions, length of stay and billing practices."

12.     On this news, the price of Acadia Healthcare common stock fell more than 16%, from a closing price of $75.66 per share on September 26, 2024, to a closing price of $63.28 per share on September 27, 2024.

13.     On October 3, 2024, Acadia Healthcare received a letter from Adam B. Schiff, Judy Chu, and Julia Brownley, members of the U.S. House of Representatives from California.  Their letter sought answers to questions raised by the Article, including reports "that inpatient psychiatric facilities owned by Acadia Healthcare have wrongfully detained patients under medically unnecessary circumstances."

14.     On this news, the price of Acadia Healthcare common stock fell more than 3.5%, from a closing price of $58.80 per share on October 2, 2024, to a closing price of $56.71 per share on October 3, 2024.

15.     On October 18, 2024, the *NYTimes* published another article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud."  According to that article, the Veterans Affairs Department is investigating whether Acadia "is defrauding government health insurance programs by holding patients longer than is medically necessary" and "whether Acadia billed

4

insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to three people with knowledge of the inquiry."

16.     On this news, the price of Acadia Healthcare common stock fell more than 12%, from a closing price of $59.32 per share on October 17, 2024, to a closing price of $52.03 per share on October 18, 2024.

17.     The truth was fully revealed to investors after markets closed on October 30, 2024, when Acadia issued a press release announcing its financial results for the third quarter of 2024. In the press release, Acadia disclosed that it had lowered its full-year 2024 revenue outlook to a range of $3.15 to $3.165 billion.  Acadia also lowered its full-year 2024 adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") to a range of $725 to $735 million.

18.     During the related earnings call held the next day on October 31, 2024, Chief Financial Officer ("CFO") Heather Dixon ("CFO Dixon") disclosed that the lowered full-year 2024 guidance was in part due to slower same-store patient day growth of only 3% in the month of October, "which we believe is a result of the recent headlines and reporting in the media."

19.     On this news, the price of Acadia Healthcare common stock fell more than 18%, from a closing price of $52.08 per share on October 30, 2024, to a closing price of $42.69 per share on October 31, 2024.

20.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in market value of the Company's securities when the truth was disclosed, Plaintiff and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

5

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Acadia Healthcare conducts significant operations in this Judicial District as the Company is headquartered in Franklin, Tennessee, and as a result, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

25. Based in Fort Lauderdale, Florida, Plaintiff the City of Fort Lauderdale Police and Firefighters' Retirement System is a public pension fund that manages over $1 billion in assets under management and provides retirement benefits to over 2,000 police officers, firefighters, and their beneficiaries. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Acadia Healthcare securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

26. Defendant Acadia Healthcare is incorporated under the laws of Delaware with its principal executive offices in Franklin, Tennessee. Acadia Healthcare's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "ACHC."

27. Defendant Debra K. Osteen ("CEO Osteen") served as Acadia Healthcare's Chief Executive Officer ("CEO") from December 2018 until her retirement in April 2022.

6

28.     Defendant Christopher H. Hunter ("CEO Hunter") has served as Acadia Healthcare's CEO since April 2022.

29.     Defendant David M. Duckworth ("CFO Duckworth") served as Acadia Healthcare's CFO from April 2011 until his resignation in July 2023.

30.     Defendant Heather Dixon has served as Acadia Healthcare's CFO since July 2023.

31.     Defendants CEO Osteen, CEO Hunter, CFO Duckworth, and CFO Dixon (collectively, the "Individual Defendants"), because of their positions with Acadia Healthcare, possessed the power and authority to control the contents of, among other things, Acadia Healthcare's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Acadia Healthcare's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

32.     Acadia Healthcare and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Acadia Healthcare purports to be the leading publicly traded pure-play provider of behavioral healthcare services in the United States. Acadia claims that it is committed to providing

7

communities with high-quality, cost-effective behavioral healthcare services, while growing the Company's business, increasing profitability, and creating long-term value for shareholders.

34.     Acadia Healthcare's growth strategy includes: expansions of existing facilities, joint venture partnerships, de novo facilities, acquisitions, and expansions across its continuum of care.  As of December 31, 2023, the Company operated 253 behavioral healthcare facilities with approximately 11,200 beds in 38 states and Puerto Rico.

35.     During the year ended December 31, 2023, the Company added 595 beds—302 added to existing facilities and 293 added through the opening of one wholly-owned facility and two joint venture facilities—and opened six comprehensive treatment centers (CTCs).  Of the Company's facilities, excluding CTCs, approximately 56% are acute inpatient psychiatric facilities, 34% are specialty treatment facilities, 10% are residential treatment centers.

36.     Acadia Healthcare derives most of its revenue from acute inpatient psychiatric facilities.  As of December 31, 2023, the Company derived 51% of its revenue from acute inpatient psychiatric facilities and 21%, 17%, and 11% of its revenue from specialty treatment facilities, CTCs, and residential treatment centers, respectively.

37.     According to the Company, Acadia Healthcare's acute inpatient psychiatric facilities provide a high level of care to stabilize patients that are a threat to themselves or others, including by providing 24-hour observation, daily intervention, and monitoring by psychiatrists. The Company claims that typical lengths of stay for "crisis stabilization" and "acute care" range from three to five days and from five to twelve days, respectively.

38.     Acadia Healthcare receives payments from various sources for services rendered in its facilities, including: (1) state governments under their respective Medicaid and other programs; (2) commercial insurers; (3) the federal government under the Medicaid program administered by

the Centers for Medicare and Medicaid Services (CMS); and (4) individual patients and clients. As of December 31, 2023, the Company received 54%, 28%, 15%, and 3% of its revenue from Medicaid, commercial payors, Medicare, and other payors, respectively.

**Defendants' Materially False and Misleading Statements**

39.     The Class Period begins on February 28, 2020, when Acadia issued its annual report on Form 10-K for the year ended December 31, 2019 (the "2019 10-K"). In the 2019 10-K, Acadia stated that it strives to "improve the operating results of our facilities by providing high-quality services, expanding referral networks and marketing initiatives while meeting the increased demand for behavioral healthcare services through expansion of our current locations as well as developing new services within existing locations." Additionally, the Company highlighted that "same facility revenue increased by $106.7 million, or 5.8%," compared to the prior year, "resulting from same facility growth in patient days of 3.2% and an increase in same facility revenue per day of 2.5%," which was a result of "ongoing demand for our services."

40.     The 2019 10-K described Acadia's "Acute Inpatient Psychiatric Facilities" as "facilities [that] provide a high level of care in order to stabilize patients that are either a threat to themselves or to others." The 2019 10-K also stated that "[l]engths of stay for crisis stabilization and acute care range from three to five days and from five to twelve days, respectively."

41.     The 2019 10-K contained the following risk disclosure:

> An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.
>
> Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. If one or more of our facilities experiences an adverse

9

patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

42. The 2019 10-K provided the following risk disclosure:

We have been and could become the subject of governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in both the U.S. and the U.K. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies and regulatory agencies in the U.K. See "Item 3. Legal Proceedings" for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

43. The 2019 10-K provided the following risk disclosure:

We may be subject to liabilities from claims brought against us or our facilities.

We are subject to medical malpractice lawsuits and other legal actions in the ordinary course of business. Some of these actions may involve large claims, as well as significant defense costs. We cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on us. All professional and general liability insurance we purchase is subject to policy limitations and in some cases, an insurance company may defend us subject to a reservation of rights. Management believes that, based

on our past experience and actuarial estimates, our insurance coverage is adequate considering the claims arising from the operations of our facilities. While we continuously monitor our coverage, our ultimate liability for professional and general liability claims could change materially from our current estimates. If such policy limitations should be partially or fully exhausted in the future, or payments of claims exceed our estimates or are not covered by our insurance, it could have a material adverse effect on our business, financial condition or results of operations. Further, insurance premiums have increased year over year and insurance coverage may not be available at a reasonable cost, especially given the significant increase in insurance premiums generally experienced in the healthcare industry.

44.    On March 3, 2020, Acadia Healthcare presented at the Raymond James Institutional Investors Conference. During the conference, CEO Osteen stated, "[W]e have had a very stable length of stay in our acute business, about 9 days, and that really has not changed over the last 4 years." CEO Osteen also noted, "One of the things and some of the business line highlights here is we do have consistent high quality across our acute service line." CEO Osteen further highlighted Acadia's referral sources, stating, "There is a broad base of referrals, which I think protects us. We're not dependent on any one particular referral source in the acute service line."

45.    On October 29, 2020, Acadia issued a press release announcing its financial results for the third quarter of 2020, ended September 30, 2020. In the press release, CEO Osteen touted Acadia's performance for the quarter, stating:

> We are pleased with our financial and operating performance for the third quarter, reflecting strong demand for our behavioral health services. The ongoing challenges and uncertainties related to the COVID-19 global pandemic have had a profound impact on everyone's lives, especially for the more vulnerable populations served by Acadia.

46.    In the same press release announcing the Company's third quarter financial results, CEO Osteen touted Acadia's efforts in providing quality care to its patients, stating:

We commend the work of our dedicated employees across our operations, who have worked hard to meet this demand and provide quality care in a safe environment. . . . We expect demand for our services will continue to increase as the mental and emotional toll caused by economic and societal concerns persists and more individuals across our markets look to Acadia for the highest quality of patient care.

47.     During the corresponding earnings call held on October 30, 2020, CEO Osteen attributed Acadia's financial performance to demand for its behavioral health services, stating:

During the third quarter, we experienced strong top line growth, with revenues up 7.2% over the prior year, reflecting robust demand for our behavioral health services. . . . We have a resilient business model that can respond to a rapidly changing environment. Acadia is well positioned to address the needs of those seeking treatment for mental health and substance use issues. And we expect that demand for our services will continue to increase.

48.     During the same earnings call, CEO Osteen continued to tout Acadia's "robust demand [that] is demonstrated by our increase in same-facility patient days of 4.2% compared to the prior year," and that "[w]ithin our acute service line, we have seen solid volumes attributable to our deep network of referral sources. . . . Our teams work closely with our patients, their families and referral sources to reinforce the message that we have the expertise and capacity to help."

49.     On February 26, 2021, Acadia issued its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), CEO Osteen and CFO Duckworth signed and filed certifications together with the 2020 10-K attesting to the accuracy of Acadia's financial reporting, the disclosure of any material changes to Acadia's internal controls, and the disclosure of all fraud.

50.     The 2020 10-K provided the following risk disclosure:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

51. The 2020 10-K provided the following risk disclosure:

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services. Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our

employees or to one or more other individuals, including members of the public. A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

52.     The 2020 10-K provided the following risk disclosure:

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies. See Note 17— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

53.     The 2020 10-K also contained the following risk disclosure:

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable

laws and regulations or where the appropriate procedures were not correctly followed. . . .

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

54.     On April 29, 2021, Acadia issued a press release announcing its financial results for the first quarter of 2021, ended March 31, 2021, in which CEO Osteen praised the quality of care given to the Company's patients: "We are proud of the hard work and dedication of Acadia's employees and clinicians across our operations who have continued to meet the critical demand for our services and provide the highest quality care in a safe and accessible manner."

55.     During the corresponding earnings call held on April 30, 2021, CEO Osteen stated:

For the first quarter of 2021, our U.S. operations produced very favorable results, driven by solid volumes and strong cost management. Our same-facility revenue increased 7.4% compared with the first quarter of 2020, including a 2.7% increase in patient days and a 4.5% increase in revenue per patient day. Acadia is well positioned to meet the needs of those seeking behavioral treatment with our diversified service lines, all of which provide high levels of exceptional patient care.

56.     During that same call, an RBC Capital Markets analyst asked about the "strong same-store top line growth. Just curious, when I look at that, it looks like nice growth in patient days and part of that driven by about 2% growth in length of stay. So I'm just curious, what's driving that increase? And then any color or any breakout on the 4.5% on the pricing side?" In response, CEO Duckworth stated, "We did see a strong revenue per day, a 4.5% year-over-year growth here in the first quarter. . . . Our team at the facility and the corporate and those that manage our payer relationships here at the corporate office are doing a great job on rate increases across our service lines." CFO Duckworth also highlighted that the "commercial payer mix did increase slightly," and was "a contributing factor to our revenue per day growth being at 4.5%."

57.     On August 3, 2021, during Acadia Healthcare's earnings call for the second quarter of 2021, ended June 30, 2021, CEO Osteen highlighted the purported drivers of Acadia's strong quarterly performance: "These results reflect increased demand for our behavioral health services and our continued focus on delivering efficiencies across our operations. We experienced favorable volume trends while providing exceptional patient care across all of our service lines."

58.     During the same earnings call, a Deutsche Bank analyst asked the Company to "talk about the revenue per day a little more," as well as "the biggest driver there." In response, CFO Duckworth stated, "[W]e were pleased to see the strong revenue per day trends continue. We had revenue per day this quarter of $816. . . . The key drivers for that are rate increases across all of our payers. . . . And we're also seeing a favorable payer mix where commercial has grown slightly." CFO Duckworth further elaborated on the revenue per day metric:

> But as we look ahead, we think where we are right now, the $816 is a very strong metric. We do expect that to continue into this year, and that will continue to provide revenue per day growth, probably more in the 2% to 3% range given that a component of this quarter is the comparison to last year. But we do think a lot of the trends that we see and the revenue per day that we see will continue moving forward.

59.     During that same earnings call, an RBC Capital Markets analyst asked: "But just curious, if you could give us an update on the state reimbursement side, the kind of updates you're seeing  any kind of supplemental payments that you may be getting or expect to continue to get? And -- or any changes you expect to see there?" In response, CFO Duckworth stated:

> Yes. The state level reimbursement, we, of course, do have a significant portion of our revenue that is Medicaid and that's across 40 different states that we're in. So we are very diversified within our Medicaid revenue. And of course, most of that at this point in our acute service line, I think over 80% of our acute Medicaid revenue is with a managed Medicaid payer.

So we continue to see at the state level, very positive coverage trends. Of course, we've talked about that with our CTC business really improving across our states, but the coverage for behavioral health continues to be very strong at the state level. We have not seen any rate decreases within our Medicaid payers.

60. On October 29, 2021, Acadia held its earnings call for the third quarter of 2021, ended September 30, 2021, during which a Credit Suisse analyst asked, "Let me just ask as my follow-up about what you're seeing as you work with acute care hospitals. I know they're an important referral source for you, but they also often have site units that compete with you." In response, CEO Osteen stated, "We have had very steady referrals from the ERs. And that really started a year ago in June. . . . And I think in June, we started to see them referring again. We've been very focused here in the company on responsiveness because we know it's important to the ERs that their patients get to the right place and that they get care and they get it in a timely way."

61. On November 9, 2021, during the Credit Suisse Healthcare Conference, CFO Duckworth continued to tout the strong demand for Acadia services: "So we do think the acute business with the demand that we see there and with more growth opportunities that we see there across the pathways. We'll continue to see the strongest revenue growth."

62. During the same Credit Suisse conference, an analyst asked about reimbursements: "Can you maybe just walk us through the different payer classes, Commercial managed care, Medicaid, Medicare. . . . And what you're seeing in terms of reimbursement trends, maybe early read on the recontracting for next year with managed care to the extent that's relevant. Any comments there?" In response CFO Duckworth stated, "[W]e have seen just an ongoing trend where there is better coverage as the demand has increased, there has been better coverage." CFO Duckworth elaborated on the Company's payers, stating, "Over 90% of our Commercial is in network, long-standing relationships that we've really invested in with our payers, locally, as well

as with our corporate managed care contracting team.  Medicare is also a significant payer at about 16%. . . . [A]nd is also a significant payer within the acute business for certain programs."

63.     On March 1, 2022, Acadia issued its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K").  Acadia announced that "[s]ame facility revenue increased by $225.6 million, or 10.9%," year-over-year, "resulting from same facility growth in patient days of 4.3% and an increase in same facility revenue per day of 6.3%."  The 2021 10-K also noted, "Consistent with the same facility patient day growth in 2020, the growth in same facility patient days for [2021] . . . resulted from the addition of beds to our existing facilities and ongoing demand for our services."

64.     Pursuant to SOX, CEO Osteen and CFO Duckworth signed and filed certifications together with the 2021 10-K attesting to the accuracy of Acadia's financial reporting, the disclosure of any material changes to Acadia's internal controls, and the disclosure of all fraud.

65.     The 2021 10-K contained provided the following risk disclosure:

> An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.
>
> Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time.  If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us.  Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations.  In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely

impact our reputation and how our referral sources and payors view us.

66.    The 2021 10-K provided the following risk disclosure:

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services.  Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users.  Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision.  There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident.   Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public.  A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition.   Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

67.    The 2021 10-K contained the following risk disclosure:

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies. See Note 20—Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

68.     The 2021 10-K provided the following risk disclosure:

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed. . . .

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

69.     On December 7, 2022, during Acadia's Investor Day Call, CEO Hunter touted the

Company's focus on quality patient care: "Our second source of differentiation is our patient-

centric approach with services that run across the continuum of care, which is so important to referral sources."

70.     During the same Investor Day Call, CEO Hunter noted, "And as I mentioned earlier, we increasingly have made a strategic choice to focus on the higher acuity patients that have the most severe conditions, think schizophrenia, bipolar disorder, various psychosis, comorbid conditions." In addition, CEO Hunter explained that focusing on higher acuity patients was a lucrative endeavor, stating, "These 2% of patients at the top of this pyramid consume 16 in percent of total spend.  So roughly $6,000 per member per year just in behavioral health."

71.     On February 28, 2023, the Company issued its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K").  Pursuant to SOX, CEO Hunter and CFO Duckworth signed and filed certifications together with the 2022 10-K attesting to the accuracy of Acadia's financial reporting, the disclosure of any material changes to Acadia's internal controls, and the disclosure of all fraud.

72.     The 2022 10-K provided the following risk disclosure:

> An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.
>
> Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time.  If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us.  Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations.  In addition, we have been and could become the subject of negative publicity or unfavorable media attention,

whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

73.     The 2022 10-K provided the following risk disclosure:

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services. Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

74.     The 2022 10-K provided the following risk disclosure:

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies. See Note 20—Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

75.     The 2022 10-K provided the following risk disclosure:

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed. . . .

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

76.     On June 7, 2023, Acadia participated in the Jefferies Global Healthcare Conference.

During the conference, addressed to CEO Hunter, a Jefferies analyst asked, "Yes. So maybe just

kind of like thoughts on what's going on with Acadia, how you feel a year into it[?]" In response, CEO Hunter stated:

> There are just so many attractive ways to deploy capital with the demand that we're seeing for our services and feel like we have very strong partnerships with our payer partners and then overall, have been able to continue to attract some really strong talent into the company as well while also promoting some of the very strong talent that we have also. So just -- a lot to like in Acadia right now.

77.    In a follow-up question, the same Jefferies analyst asked CEO Hunter to elaborate on the "factors that are driving" demand and "how sustainable" CEO Hunter thought these factors were. CEO Hunter responded, "Yes, I think it is sustainable. . . . The demand side of the equation continues to be really strong." CEO Hunter further explained that "[t]here are multiple things that are behind that. . . . You're also seeing coming out of COVID, kind of a de-stigmatization around mental health and more people that are willing to access services."

78.    On July 28, 2023, Acadia held its earnings call for second quarter of 2023, ended June 30, 2023. During the call, a UBS analyst inquired about Acadia's guidance: "Just wanted to better understand the strengthening trends that you're seeing and that prompted you to raise the outlook for the back half of the year?" CFO Dixon responded:

> I would point to a few things that are really driving the confidence that we have to look towards the back half of the year. The first is volume trends, reflecting strong demand, occupancy rates and capacity additions. The second is improved visibility into the back half of the year for our revenue per day. We expect that to continue for the full year to be in mid-single digits. And then finally, I would point to labor costs continuing to moderate throughout the year.

79.    On September 6, 2023, Acadia attended the Wells Fargo Securities Healthcare Conference. During the conference, an analyst asked, "I guess as you think about what's changed in the business as you've kind of gone through COVID and come out of it. . . . [W]hat are the key things that stick out? And . . . what opportunities does it create for the company across 2 different

service lines?"  In response, CEO Hunter stated, "[W]e continue to see record demand for all 4 lines of business[,] and we don't see that dissipating anytime soon. . . .  Behavioral health admissions in the ER are up 400% in the last decade.  And we've even seen some data that 1 in 7 admissions right now is -- into an ER is explicitly for diagnosis around behavioral health."  CEO Hunter further stated, "[W]e're just seeing really strong volume, really strong demand and interest and just don't see that tapering."

80.     On February 28, 2024, Acadia issued its annual report on Form 10-K for the year ended December 31, 2023 ("2023 10-K"), in which Acadia touted that "[s]ame facility revenue increased by $309.3 million, or 12.0%," year-over-year, "resulting from same facility growth in patient days of 5.1%, an increase in same facility revenue per patient day of 6.5% and an increase in same facility admissions of 4.9%."  The 2023 10-K also stated, "Consistent with the same facility patient day growth in 2022, the growth in same facility patient days for the year [2023] . . . resulted from the addition of beds to our existing facilities and ongoing demand for our services."

81.     Pursuant to SOX, CEO Hunter and CFO Dixon signed and filed certifications together with the 2023 10-K attesting to the accuracy of Acadia's financial reporting, the disclosure of any material changes to Acadia's internal controls, and the disclosure of all fraud.

82.     The 2023 10-K provided the following risk disclosure:

> An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, litigation, negative publicity and adversely affect the trading price of our common stock.
>
> Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, have occurred in the past and could continue to occur in the future.  As a result of adverse patient incidents, we have experienced admissions holds, adverse regulatory action, civil litigation, negative publicity

and negative impacts on referrals.  If one or more of our facilities experiences an adverse patient incident in the future or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us.  Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations.  In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

83.     The 2023 10-K provided the following risk disclosure:

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services.  Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press, civil liability or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users.  Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision.  Our service users have in the past been harmed by one or more of our employees, and could in the future be harmed by our employees, either intentionally, through negligence or by accident.  Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public.  A serious incident involving harm to one or more service users or other individuals could result in negative publicity.  Such negative publicity could

have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

84.     The 2023 10-K provided the following risk disclosure:

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies. See Note 11—Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

85.     The 2023 10-K provided the following risk disclosure:

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

We have been in the past and will continue in the future to be subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed. Similarly, we have been in the past and will continue in the future to be subject to substantial claims from employees in respect of personal injuries

sustained in the performance of their duties. Current or former employees may also make claims against us in relation to breaches of employment laws. There may also be safeguarding incidents at our facilities which, depending on the circumstances, may result in custodial sentences or other criminal sanctions for the member of staff involved. . . .

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material impact on our business, results of operations and financial condition.

86. The statements set forth above in ¶¶ 39-85 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Acadia admitted patients and held them against their will and beyond the length of time that was medically necessary in order to deceive payors—including Medicaid, commercial payors, Medicare, and other payors—into continuing to pay for such patients' care; (2) Acadia would not release patients until their insurance ran out; (3) in order to achieve the above, Acadia deployed Company assessors to pressure E.R.s to send patients to Company facilities, filed frivolous petitions with courts to delay patients' release, and directed employees to use buzzwords and avoid using other words in patients' charts to create a false impression of patients' mental state; (4) Acadia's admissions, length of stay, and billing practices would subject the Company to government investigations and actions and heightened media scrutiny; (5) in light of such government investigations and actions and media scrutiny, Acadia's relationships with its referral sources would be negatively impacted; (6) as a result of the above, Acadia experienced slower same-store patient volumes, and in turn, the Company would be forced to lower its full-year 2024 outlook; and (7) as a result of the above,

Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Begins to Emerge**

87.    On September 1, 2024, investors began to learn the truth about Acadia Healthcare's inpatient services when the *NYTimes* published the Article, entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients."  According to the Article, a *NYTimes* investigation found that some of Acadia Healthcare's success "was built on a disturbing practice: Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary."

88.    The Article describes how, "[i]n at least 12 of the 19 states where Acadia operates psychiatric hospitals, dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law. . . .  In some cases, judges have intervened to force Acadia to release patients."

89.    The Article further describes how "[s]ome patients arrived at emergency rooms seeking routine mental health care, only to find themselves sent to Acadia facilities and locked in." For example, the Article provided several specific accounts of patients held against their will:

> A social worker spent six days inside an Acadia hospital in Florida after she tried to get her bipolar medications adjusted.  A woman who works at a children's hospital was held for seven days after she showed up at an Acadia facility in Indiana looking for therapy.  And after police officers raided an Acadia hospital in Georgia, 16 patients told investigators that they had been kept there "with no excuses or valid reason," according to a police report.
>
> Acadia held all of them under laws meant for people who pose an imminent threat to themselves or others.  But none of the patients appeared to have met that legal standard, according to records and interviews.

90.     According to the Article, "[m]ost doctors agree that people in the throes of a psychological crisis must sometimes be detained against their will to stabilize them and prevent harm. These can be tough calls, balancing patients' safety with their civil rights."  However, the Article explains how, "at Acadia, patients were often held for financial reasons rather than medical ones, according to more than 50 current and former executives and staff members."

91.     The Article details how, based on accounts from employees, Acadia implemented strategies to prioritize financial gain over medical necessity.  For example, the Article explains:

> Acadia, which charges $2,200 a day for some patients, at times deploys an array of strategies to persuade insurers to cover longer stays, employees said.  Acadia has exaggerated patients' symptoms. It has tweaked medication dosages, then claimed patients needed to stay longer because of the adjustment.  And it has argued that patients are not well enough to leave because they did not finish a meal.

> Unless the patients or their families hire lawyers, Acadia often holds them until their insurance runs out.

> "We were keeping people who didn't need to be there," said Lexie Reid, a psychiatric nurse who worked at an Acadia facility in Florida from 2021 to 2022.

92.     The Article details how Acadia dispatched "assessors" to emergency rooms to help them "determine whether patients need to be hospitalized."  While such determinations were supposed to be made in the patients' best interests, "several said Acadia scolded them when they suggested that patients be sent to other psychiatric hospitals."  For example:

> Valerie McGuinness, who worked as an assessor for Acadia until 2019, said there was "consistent pressure to send patients to Acadia facilities."

> "We'd get emails and calls and texts berating us," she said, adding, "It made me feel really gross, because Acadia hospitals were not always the best ones for patients."

> A colleague, Gwyneth Shanks, agreed, saying it "felt deeply unethical."

93.    Further describing the pressure exerted by Company assessors, the Article quotes LeDesha Haynes, a former human resources director at Lakeview Behavioral Health Hospital, an Acadia facility in Georgia, who "said that when the hospital had empty beds, 'the assessors were always being pressured and told to beat the bushes.'  She added, 'Their judgment was clouded.'"

94.    The Article states that the *NYTimes* "identified eight instances of Acadia's holding people who had voluntarily checked themselves in but then changed their minds."  For example:

> One of those patients was the hospital worker in Indiana, who asked for anonymity because she didn't want her health issues made public.  She sought treatment at an Acadia hospital in Indianapolis, but was then held against her will when she asked to leave, according to a complaint filed with the state's attorney general.  She was released after her father went to court.

95.    The Article also details how Acadia Healthcare used "buzzwords" to hold patients against their will and/or when not medically necessary.  According to the Article, "once Acadia gets patients in the door, it often tries to hold them until their insurance runs out.  Acadia goes to great lengths to convince insurers that the patients should stay as long as possible, often around five days."  To do so, "Acadia needs to show that patients are unstable and require ongoing intensive care.  Former Acadia executives and staff in 10 states said employees were coached to use certain buzzwords, like 'combative,' in patients' charts to make that case."

96.    Further describing the Company's use of buzzwords, the Article explains:

> In 2022, for example, state inspectors criticized an Acadia hospital in Reading, Pa., for having instructed workers to avoid adjectives like "calm" and "compliant" in a patient's chart.  That same year, employees at Acadia hospitals in Ohio and Michigan complained to their state regulators that doctors had written false statements in patients' medical charts to justify continuing their stays.
>
> At an Acadia hospital in Missouri, three former nurses said, executives pressured them to label patients whose insurance was about to run out as uncooperative.  Acadia employees then would argue to insurance companies that the patients weren't ready to

leave. Sometimes, the nurses said, they wrote patients up for not finishing a meal or skipping group therapy.

97. The Article then explains how, "[o]nce Acadia won more insurance days for patients, it often would not release them before their insurance ran out, according to dozens of former Acadia executives, psychiatrists and other staff members." In support of this claim, the Article quotes Jessie Roeder, a "top executive at two Acadia hospitals in Florida in 2018 and 2019[,]" who stated, "'If there were insurance days left, that patient was going to be held[.]"

98. The Article also describes Acadia Healthcare's efforts to work around state laws mandating a maximum number of days a patient can legally be involuntarily held:

> Under state laws, patients generally must pose an imminent threat to themselves or others in order to be held against their will in a psychiatric facility. Even then, hospitals can hold people for just a handful of days, unless the patients agree to stay longer or a judge or a medical professional determines that they are not ready to leave.
>
> In Florida, the limit for holding patients against their will is 72 hours. To extend that time, hospitals have to get court approval.
>
> Acadia's North Tampa Behavioral Health Hospital found a way to exploit that, current and former employees said.
>
> From 2019 to 2023, North Tampa filed more than 4,500 petitions to extend patients' involuntary stays, according to a Times analysis of court records.
>
> Simply filing a petition allowed the hospital to legally hold the patients—and bill their insurance—until the court date, which can be several days after the petition is filed. . . . Judges granted only 54 of North Tampa's petitions, or about 1 percent of the total.

99. As a result of this news, the price of Acadia Healthcare common stock fell more than 4.5%, from a closing price of $81.93 per share on August 30, 2024, the prior trading day, to a closing price of $78.21 per share on September 3, 2024, the following trading day.

100.    Nevertheless, in the Article, Company spokesman Tim Blair defended Acadia Healthcare's purported commitment to quality and medically necessary care at its facilities.  For example, Blair "would not comment on individual patients, citing privacy laws[,]" but Blair "said the patient examples cited by The Times were not representative of many patients with positive experiences."  Blair further claimed: "'Still, to be clear: Any incident that falls short of our rigorous standards is unacceptable, and actions are taken to address it,' Mr. Blair said.  He added, 'Quality care and medical necessity drives every patient-related decision at Acadia.'"

101.    In the Article, Company spokesman Tim Blair also claimed that since CEO Hunter was appointed in 2022, "the Company has improved the quality of care and the training of its employees, "'all to support enhanced patient safety.'"  In response to the allegation that Acadia Healthcare's North Tampa Behavioral Health Hospital had filed "more than 4,500 petitions to extend patients' involuntary stays," Blair stated that "this was often necessary to provide enough care to stabilize patients."

102.    On September 26, 2024, the *NYTimes* published another article entitled "Acadia Hospitals Reach $20 Million Settlement With Justice Dept."  The article explains that Acadia Healthcare had agreed to a nearly $20 million settlement with the DOJ, related to a DOJ investigation into the Company's practices of holding "patients for longer than necessary" at its facilities and admitting "people who didn't need to be there."  The article notes, "Once patients entered its facilities, the government said, Acadia failed to provide therapy and kept staffing dangerously low, leading to assaults and suicides."

103.    In response to the DOJ settlement, Acadia continued to tout its commitment to providing quality care to its patients.  In the same *NYTimes* article, Company spokesman Tim Blair "said that the company had been cooperating with the government and did not admit any

wrongdoing. He said that resolving the investigation 'allows us to ensure our focus remains on providing quality care to our patients and their families.'"

104. Then, on September 27, 2024, before the markets opened, Acadia Healthcare filed a current report on Form 8-K with the SEC. The current report disclosed that on September 24, 2024, the Company had "received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri (W.D.Mo.) related to its admissions, length of stay and billing practices."

105. The September 27, 2024 current report further disclosed that "Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo. on the same day regarding similar subject matter." In addition, the current report disclosed that the Company "anticipates receiving similar document requests from" the SEC and "may receive additional document requests from other governmental agencies."

106. As a result of this news, the price of Acadia Healthcare common stock fell more than 16%, from a closing price of $75.66 per share on September 26, 2024, to a closing price of $63.28 per share on September 27, 2024.

107. Also on September 27, 2024, the *NYTimes* published another article entitled "Acadia Healthcare Says It Faces New Federal Investigations," which reported on the federal investigations into the Company's admissions and billing practices. Despite the recent revelations, the Company continued to deny any wrongdoing: "Acadia also said that the experiences of patients described in the Times article [published on September 1, 2024] were 'completely inconsistent with Acadia's policies' and that 'all decisions on patient care, including whether treatment is necessary and for how long, are made by licensed physicians' and follow the law."

34

108.    On October 3, 2024, Acadia Healthcare received a letter from Adam B. Schiff, Judy Chu, and Julia Brownley, members of the U.S. House of Representatives from California, demanding answers to questions raised by the Article, including reports "that inpatient psychiatric facilities owned by Acadia Healthcare have wrongfully detained patients under medically unnecessary circumstances."  Among other things, Representatives Schiff, Chu, and Brownley demanded detailed responses from Acadia about: (1) "the standard intake process for patients admitted under emergency hold at Acadia inpatient psychiatric facilities[;]" (2) "the average length for an inpatient stay among patients admitted under an emergency hold[;]" and (3) the "percentage of patients [that] are covered by private health insurance[,] . . . Medicare[,] and Medicaid."

109.    As a result of this news, the price of Acadia Healthcare common stock fell more than 3.5%, from a closing price of $58.80 per share on October 2, 2024, to a closing price of $56.71 per share on October 3, 2024.

110.    On October 18, 2024, the *NYTimes* published another article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud."  According to that article, the Veterans Affairs Department is investigating whether Acadia "is defrauding government health insurance programs by holding patients longer than is medically necessary[.]"  The article explains that "[t]he veterans agency is looking into whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to three people with knowledge of the inquiry."  The article also notes that "[s]everal former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department."

111.    As a result of this news, the price of Acadia Healthcare common stock fell more than 12%, from a closing price of $59.32 per share on October 17, 2024, to a closing price of $52.03 per share on October 18, 2024.

112.    The statements set forth above in ¶¶ 100-01, 103-05, 107 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) Acadia admitted patients and held them against their will and beyond the length of time that was medically necessary in order to deceive payors—including Medicaid, commercial payors, Medicare, and other payors—into continuing to pay for such patients' care; (2) Acadia would not release patients until their insurance ran out; (3) in order to achieve the above, Acadia deployed Company assessors to pressure E.R.s to send patients to Company facilities, filed frivolous petitions with courts to delay patients' release, and directed employees to use buzzwords and avoid using other words in patients' charts to create a false impression of patients' mental state; (4) Acadia's admissions, length of stay, and billing practices would subject the Company to government investigations and actions and heightened media scrutiny; (5) in light of such government investigations and actions and media scrutiny, Acadia's relationships with its referral sources would be negatively impacted; (6) as a result of the above, Acadia experienced slower same-store patient volumes, and in turn, the Company would be forced to lower its full-year 2024 outlook; and (7) as a result of the above, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Revealed**

113.    On October 30, 2024, after markets closed, the truth was fully revealed when Acadia Healthcare issued a press release announcing its financial results for the third quarter of 2024, ended September 30, 2024.  In the press release, the Company disclosed that it had lowered its full-year 2024 revenue outlook to a range of $3.15 to $3.165 billion, below the prior range of $3.18 to $3.23 billion.  The Company also lowered its full-year 2024 adjusted EBITDA to a range of $725 to $735 million, below the prior range of $725 million to $765 million.

114.    On the same day after markets closed, Acadia Healthcare also filed its quarterly report on Form 10-Q with the SEC.  In the quarterly report, the Company disclosed, "Certain members of the United States Congress have requested, and such members or other members may in the future request, information from or about the Company related to, among other things, the Company's admissions, length of stay and billing practices."  The Company further stated that it "intends to cooperate with any such request.  At this time, the Company cannot speculate on the outcome or duration of any such inquiries."

115.    In the corresponding earnings call held the next day, CEO Hunter addressed the recent media scrutiny the Company had received, including the Article published by the *NYTimes* on September 1, 2024, which revealed the Company's fraudulent admissions, length of stay, and billing practices at its psychiatric care facilities.  In relevant part, CEO Hunter stated:

> With respect to recent and [in]accurate media reports about Acadia behavioral health facilities.  We want to share more about how our facilities operate and how we aim not only to meet, but exceed the standards that regulation requires.
>
> First, I want to be clear, medical necessity drives patient care decisions at Acadia.  These decisions are made by licensed providers and adhere to all associated legal requirements.  The allegation that Acadia systematically holds patients longer than medically necessary is false and goes directly against everything we do and stand for when it comes to patient care.

116.    Later during the same call, CFO Dixon disclosed that the lowered full-year 2024 guidance was in part due to slower same-store patient day growth of only 3% in the month of October, "which we believe is a result of the recent headlines and reporting in the media that Chris [Hunter] addressed at the top of the call." CFO Dixon further stated:

> We do expect these headwinds to be transitory in nature, however, and as we have been doing for some time now, we continue to engage with our referral sources and our local communities to ensure that we are addressing any concerns as they arise. This change in our volume growth outlook for the fourth quarter resulted in a $20 million to $30 million impact to our revenue guidance and a $10 million to $15 million impact to our EBITDA outlook.

117.    During that same call, a UBS analyst asked if the "media dynamics," particularly the Article, and "subsequent inquiries" will continue to affect the Company's growth. In response, CFO Dixon further addressed the negative impact on the Company's business, stating:

> I'll start with your question about sort of the step-down and what we saw. We did see that step down beginning at the start of October. And we saw that run pretty consistently throughout the month of October. So to answer your question, we didn't see a continued decline throughout the month. We saw relatively stable volumes for the month of October.
>
> In regards to your question about sort of any concentration or where we saw this, we do, as I mentioned, expect that the recent news coverage and the news of the investigation has had some moderating effect on the growth that it's early days. We see this as largely temporary, and we've been working with our partners to sort of identify any specific questions that they have.

118.    Furthermore, Acadia Healthcare further elaborated that the recent media coverage, including local coverage, had caused some level of concern from the Company's referral sources. For example, a Jefferies analyst asked, "[M]aybe just circling back to the conversations you're having with the referral sources and your [joint venture] partners. . . . So if you can walk us through

what that looks like. And so far, what's the feedback? And are you seeing any change in behavior from those referral sources at this point?" In response, CEO Hunter stated,

> [A]s you can imagine, I mean, we've been highly engaged with outreach to really multiple stakeholders. I mean, certainly, key referral sources as well as [joint venture] partners for the last several months.

> I would also say that we all know health care is local. And with so many of these literally thousands of referral sources being on the ground across the country, we've had to be even more deliberate about the outreach. I think, particularly to shore up any misunderstandings that sometimes have been the case due to media reporting.

119. In continuing to respond to that same question from the Jefferies analyst, CEO Hunter stated, "[W]e've been really consistent about emphasizing the quality of the care that we provide, the investments that we're making in safety, compliance, quality over the last 2 years. . . . And we placed a lot of emphasis on ensuring that our most important referral sources . . . understand where we believe some of the media reporting has been inconsistent or inaccurate." CEO Hunter further noted, "I think in the small percentage of cases where we have heard any concern, these really tend to be a little bit more correlated with intense local media coverage within that facility local market rather than any broader news at the national level."

120. Analysts swiftly reacted to this news. For example, Cantor analysts highlighted that Acadia "unexpectedly lowered revenue and EBITDA guidance due to lower October volumes, which management believes was directly correlated to a drop off in referrals after media outlets alleged length of stay was influenced by ability to pay." Jefferies analysts commented, "Despite seeing positive volume momentum in Q3, the emergence of negative press reports on the company (NY Times article) and emergence of government investigations in Sept[ember] influenced patient referral sources, which translated to softer-than-expected trends in Oct[ober]."

39

121.    As investors digested this news, the price of Acadia Healthcare common stock fell $9.39 per share, or more than 18%, from a closing price of $52.08 per share on October 30, 2024, to a closing price of $42.69 per share on October 31, 2024, on extraordinary trading volume.

## CLASS ACTION ALLEGATIONS

122.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Acadia Healthcare securities between February 8, 2020 and October 30, 2024, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

123.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, Acadia Healthcare securities actively traded on the Nasdaq (an open and efficient market) under the symbol "ACHC." Millions of Acadia Healthcare shares were traded publicly during the Class Period on the Nasdaq. As of October 30, 2024, the Company had more than 92.8 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by Acadia Healthcare or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

124.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Acadia Healthcare;

d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Acadia Healthcare;

e)    whether the market price of Acadia Healthcare securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

127.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

128. The market for Acadia Healthcare securities was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Acadia Healthcare securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Acadia Healthcare securities relying upon the integrity of the market price of the Company's shares and market information relating to Acadia Healthcare and have been damaged thereby.

129. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Acadia Healthcare securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Acadia Healthcare's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's securities to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

130.     As alleged herein, Defendants acted with scienter in that Defendants: knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

131.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acadia Healthcare, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Acadia Healthcare, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

132.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

133.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Acadia Healthcare who knew that the statement was false when made.

## LOSS CAUSATION

134.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

135.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Acadia Healthcare securities and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Acadia Healthcare securities fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

136.    The market for Acadia Healthcare securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Acadia Healthcare securities traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Acadia Healthcare securities and market information relating to Acadia Healthcare and have been damaged thereby.

137.    At all times relevant, the market for Acadia Healthcare securities was an efficient market for the following reasons, among others:

        a)    Acadia Healthcare securities were listed and actively traded on the Nasdaq, a highly efficient and automated market;

b)      As a regulated issuer, Acadia Healthcare filed periodic public reports with the SEC and/or the Nasdaq;

c)      Acadia Healthcare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)      Acadia Healthcare was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

138.    As a result of the foregoing, the market for Acadia Healthcare securities promptly digested current information regarding Acadia Healthcare from all publicly available sources and reflected such information in the price of Acadia Healthcare securities.  Under these circumstances, all purchasers of Acadia Healthcare securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices, and a presumption of reliance applies.

139.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of

reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

140.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Acadia Healthcare securities; and (iii) cause Plaintiff and other members of the Class to purchase Acadia Healthcare securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

142.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Acadia Healthcare securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either

as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

143.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Acadia Healthcare's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Acadia Healthcare's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Acadia Healthcare and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

144.    Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's

management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

145.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Acadia Healthcare's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

146.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Acadia Healthcare securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the securities traded or trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Acadia Healthcare securities during the Class Period at artificially inflated prices and were damaged thereby.

147.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Acadia Healthcare was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Acadia Healthcare securities, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

148.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

150.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

151.     The Individual Defendants acted as controlling persons of Acadia Healthcare within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false

and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

152.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

153.    As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

154.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)   Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

50

d) Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

128.    Plaintiff demands a trial by jury.

Dated: December 10, 2024

Respectfully submitted,

**WATSON BURNS, PLLC**

By:/s/*William F. Burns*
William F. Burns (TN Bar# 17908)
5865 Ridgeway Center Parkway
Suite 300
Memphis, TN 38120
Tel.: (901) 529-7996
Email: bburns@watsonburns.com

*Local Counsel for Plaintiff City of Fort Lauderdale Police and Firefighters' Retirement System*

**SAXENA WHITE P.A.**
Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
Email: mduenas@saxenawhite.com

*Counsel for Plaintiff City of Fort Lauderdale Police and Firefighters' Retirement System*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, FL 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
Email: bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Fort Lauderdale Police and Firefighters' Retirement System*

51